UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LISA MARTINEZ,

                              Plaintiff,

          v.

CELTIC BANK,

                              Defendant.

No. 22-CV-6327 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:

Ari Hillel Marcus, Esq.
Yitzchak Zelman, Esq.
Marcus & Zelman, LLC
Asbury Park, NJ
*Counsel for Plaintiff*

Aylix Jensen, Esq.
John P. Boyle, Esq.
Michael Thomas Etmund, Esq.
Moss & Barnett PA
Minneapolis, MN
*Counsel for Defendant*

John Rossman, Esq.
Rossman Attorney Group, PLLC
Edina, MN
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

Plaintiff Lisa Martinez ("Plaintiff") brings this Action against Celtic Bank ("Celtic" or "Defendant") for violations of the Fair Credit Reporting Act ("FCRA"). *See* 15 U.S.C. § 1681s-2(b). Before the Court is Defendant's Motion for Partial Summary Judgment. (*See* Not. of Mot. (Dkt. No. 80).) For the foregoing reasons, Defendant's Motion is granted in part and denied in part.

I.  Background

A.  Factual Background

Plaintiff opened an Indigo Platinum Mastercard account with Celtic Bank ("Celtic" or "Defendant") in 2019.  (Def's 56.1 Statement ("Def's 56.1") ¶¶ 2–3 (Dkt. No. 88); Pl's Resp. 56.1 Statement ("Pl's Resp. 56.1") ¶¶ 2–3 (Dkt. No. 92).)  Defendant does not service those cards itself and has instead used Genesis FS Card Services, Inc. ("Genesis") as a servicer since 2015.  (Def's 56.1 ¶ 1; Pl's Resp. 56.1 ¶ 1.)

1.  The DRP

During the COVID-19 pandemic, Genesis—in its capacity as Celtic's servicer—enrolled eligible cardholders, including Plaintiff, in a Disaster Relief Program ("DRP"), which provided certain short-term relief to negatively impacted consumers.  (Def's 56.1 ¶ 5; Pl's Resp. 56.1 ¶ 5.) That relief included reduced APR, reduced monthly minimum payments, and a waiver of certain late and overlimit fees.  (Def's 56.1 ¶ 6; Pl's Resp. 56.1 ¶ 6.)

On May 27, 2020, Genesis received a telephone call from Plaintiff about her Account. The following excerpt from that call between Plaintiff ("P") and a Genesis representative ("R") is core to this case:

> R:      For the disaster relief program ma'am okay uhm you will be receiving a
>          letter ma'am within two weeks and if you are qualified the account will
>          receive a temporary reduction in annual percentage rate. We will reduce the
>          minimum payment. Late fees and over the limit fees ma'am will be
>          suppressed while you are on the program. Okay?
> P:      I would appreciate that. I can make my I mean I can make my minimum
>          payments but I mean I just don't want to be reported to the credit bureau.
>          This is not a good thing you know what I'm saying?
> R:      Ma'am uhm it shows also here on our end ma'am that *once the account
>          ma'am is registered on our disaster relief program uhm we will not report
>          it ma'am to the credit bureau as a late.*
> P:      Alright. Do I need . . . right now I shouldn't uhm alright so right now do I
>          need to make a payment right now?

2

R:      Your payment due date ma'am it will be on June 13, 2020 and it[']s up to
        you ma'am.

(Bryman Decl. Ex. C ("5/27 Call Tr.") (Dkt. No. 84-3) (emphasis added).)[1]  Following that call,

Genesis sent Plaintiff a payment reminder email around June 9, 2020, and Plaintiff submitted a

$80.00 payment on June 13.  (Def's 56.1 ¶¶ 11–12; Pl's Resp. 56.1 ¶¶ 11–12.)  Defendant states

that it mailed Plaintiff a bill on July 14, 2020, advising Plaintiff that her account was past due, a

follow-up letter on July 24, 2020, and a delinquent payment reminder on August 11, 2020.

(Def's 56.1 ¶¶ 13–15.)[2]  Defendant did not receive a payment from Plaintiff that month and thus

reported to Credit Reporting Agencies ("CRAs") that the account was 30 days delinquent for

August 2020 (the "August 2020 delinquency").  (Def's 56.1 ¶ 17; Pl's Resp. 56.1 ¶ 17.)

            2.  Disputes with Genesis

        Fast forward to December 15, 2021.  Plaintiff placed two calls to Genesis about her

account, advised that she was applying for a mortgage, and wondered why the August 2020

delinquency was still being reported given her earlier conversation.  (See Def's 56.1 ¶ 19; Pl's

Resp. 56.1 ¶ 19.)[3]  The Genesis representative responded that he would like to listen to the

_____

[1] There is a discrepancy between the language quoted in Defendant's Statement and the transcript attached to Defendant's declaration.  (Compare Def's 56.1 ¶ 8 ("[I]n our Disaster Relief Program *you* will not be reported, ma'am, to the credit bureaus as late." (emphasis added)), *with* 5/27 Call Tr. at 3 ("[O]nce the account ma'am is registered on our disaster relief program uhm we will not report *it* ma'am to the credit bureau as a late." (emphasis added)).)  To the extent the record of this call is disputed, the Court adopts the account favorable to Plaintiff, the non-movant: that Genesis would not report the *account* as late.

[2] Plaintiff states that she did not receive all of these notifications and disputes their accuracy.  (Pl's Resp. 56.1 ¶¶ 13–15.)  The Court cites them here, not for their truth, but simply as helpful context.

[3] Defendant suggests Plaintiff "expressly acknowledged her responsibility" for the August 2020 delinquency on this call.  (See Def's 56.1 ¶ 19.)  But the call transcript contains no such language, and it is inappropriate to draw such an inference for the movant.

recording, as Plaintiff's account of the conversation did not match up with Genesis training practices. (*Id*.; *id*.)

On March 11, 2022, Plaintiff again inquired about her payment history, advising that, based on her understanding of the DRP, she could defer payments and thus pay at any time. (Def's 56.1 ¶ 28; Pl's Resp. 56.1 ¶ 28.) Additionally, Plaintiff filed complaints with the Consumer Financial Protection Bureau ("CFPB") in February and March, 2022, raising similar concerns including that her payments "should not have been reported as late." (*See* Def's 56.1 ¶¶ 32–33; Pl's Resp. 56.1 ¶¶ 32–33; *see also* Decl. of John K. Rossman in Supp. of Mot ("Rossman Decl."), Exs. 1, 2 (Dkt. No. 82).) Defendant claims that Plaintiff was inconsistent and even misleading about the existence and nature of the delinquency in her various inquiries. (*See* Def's 56.1 ¶¶ 23–31; *see also* Mem of Law in Supp. of Mot. ("Def's Mem.") 1, 14–16 (Dkt. No. 81).) It interpreted her complaints to challenge whether she ever missed a payment, not to challenge the *reporting* of a delinquency that she was properly assessed. (Def's Mem. 17–23.) The last statement by Plaintiff in her CFPB complaints provides enough evidence to dispute this account and, as discussed below, arguably should have put Defendant on notice regarding her objection to the credit report.

Genesis wrote Plaintiff in response on May 3, 2022, stating:

> We have reviewed the payment history for your Account and determined that we did not receive the minimum payment for the July 2020 and August 2020 billing cycles by the due date. However, we have determined that when you initially called to request financial assistance on May 27, 2020, the agent did not thoroughly explain the above terms and as such, we have requested that the credit reporting agencies remove the delinquency from August 2020 from your credit report.

(Decl. of Evan Bryman ("Bryman Decl."), Ex. X ("May 3, 2022 Ltr.") (Dkt. No. 84-24).) Celtic followed up the next day with an email similarly advising that it would request that the CRAs

remove the August 2020 delinquency from her credit report.  (Def's 56.1 ¶ 31; Pl's Resp. 56.1 ¶ 31.)

Genesis followed through on that promise by filing five automated universal dataforms ("AUDs") with various CRAs.  AUDs are a vehicle for furnishers of credit information (like Defendant) to update or delete information that they determine to be incomplete or inaccurate. (Def's 56.1 ¶¶ 56–57; Pl's Resp. 56.1 ¶¶ 56–57.)  Genesis submitted those forms on May 5, June 27, July 14, and August 17, 2022.  (*Id.*; *id.*)

Genesis's account notes—records of customer interactions or actions taken on a given account (*see* Decl. of Yitzchak Zelman ("Zelman Decl.") (Dkt. No. 92), Ex. A ("Dale Dep."), at 24)—reflect similar events.  Specifically, a May 5, 2022, entry states that Genesis sent an AUD requesting removal of the August 2020 delinquency, and a May 12, 2022, note includes language substantially similar to Genesis' letter quoted above.  (*See* Pl's Resp. 56.1 ¶¶ 74–75; Def's Resp. ¶¶ 74–75.)

### 3.  Disputes with CRAs

In addition to disputing the 30-day delinquency directly with Genesis and the CFPB, Plaintiff also submitted written disputes to the CRAs.  Those CRA disputes are memorialized in six Automated Credit Dispute Verification ("ACDV") requests, through which the CRAs asked Celtic to verify delinquencies reported on Plaintiff's account.   As reflected below, each ACDV directed Defendant to verify information regarding Plaintiff's account status, payment rating, and account history, and some included additional detail:

- ACDV No. 1 (January 19, 2022)—The first ACDV disclosed Plaintiff's dispute as follows: "Dispute Code 1: 106: Disputes present/previous Account Status/Payment Rating/Account History. Verify Account Status, Payment Rating and Account History." (Decl. of Misty Dale in Supp. of Mot. ("Dale Decl."), Ex. Z ("1/19/22 ACDV") (Dkt. No. 83-1).) In addition, the January 19, 2022, ACDV provided "/PAID (A2) ||||BAL:0|ACT. DT:01/19/22||||||||||||||||." (*Id.*)

- ACDV No. 2 (February 17, 2022)—Like the January 19, 2022, ACDV, the February 17, 2022 ACDV disclosed Plaintiff's dispute as follows: "Dispute Code 1: 106: Disputes present/previous Account Status/Payment Rating/Account History. Verify Account Status, Payment Rating and Account History." (Dale Decl. Ex. AA ("2/17/22 ACDV") (Dkt. No. 83-2).)  In addition, the February 17, 2022, ACDV provided, "I HAVE NEVER BEEN LATE ON THIS ACCOUNT I HAVE SPOKEN WITH THE CREDITOR AND THEY CONFIRMED THAT THEY ARE NOT REPORTING ANY LATE PAYMENTS. PLEASE CORRECT IT." (*Id*.)

- ACDV No. 3 (April 14, 2022)—This ACDV included the same dispute code as the previous two requests but contained no additional information.  (Dale Decl., Ex. BB ("4/14/22 ACDV") (Dkt. No. 83-3).)

- ACDV No. 4 (May 11, 2022)—This request, from Equifax, contained the same dispute code as the other ACDVs, and provided that "CONSUMER STATES TO REMOVE THE LATE PAYMENT FOR YEAR 2020 JULY CONSUMER STATES THAT SHE NEVER LATE PAYING THIS ACCOUNT SHE ALREADY FILE THIS TO CFPB."  (Dale Decl., Ex. CC ("5/11/22 ACDV") (Dkt. No. 83-4).)

- ACDV No. 5 (June 9, 2022)—Like the previous ACDVs, the June 9 request was coded to reflect a payment history / account status dispute and provided "CONSUMER STATES THAT SHE NVERLATE PAYMENT THIS ACCOUNT FROM JUNE 2020."  (Dale Decl., Ex. DD ("6/9/22 ACDV") (Dkt. No. 83-5).)

- ACDV No. 6 (June 10, 2022)—This request contained the same dispute code as all the others and provided that "cons claims that I was never late in this acct."  (Dale Decl., Ex. EE ("6/10/22 ACDV") (Dkt. No. 83-6).)

Defendant contends that it conducted an investigation after receiving each request.  (Def's 56.1

¶¶ 39, 42, 45, 48, 51, 54.)[4]  Here, too, Defendant interpreted the ACDVs to dispute whether

Plaintiff ever made a late payment, as opposed to whether her late payment should have been

_____

[4] Plaintiff argues that Defendant provides no admissible evidence, or testimony of a witness with personal knowledge, to establish either that the investigations occurred or that they occurred in the manner Defendant suggests. (*See, e.g*., Pl's Resp. 56.1 ¶ 39.) *See also Sec. & Exch. Comm'n v. Mattessich*, 523 F. Supp. 3d 624, 633 (S.D.N.Y. 2021) ("A court may rely on an affidavit when deciding a motion for summary judgment only if it is 'made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated.'" (alterations in original) (quoting Fed. R. Civ. P. 56(c)(4))).  The Court considers this issue in § II.B.2.b. infra.

reported. (*See* Def's Mem. 17–22.)  In its Motion, Defendant argued that this interpretation reasonably triggered a narrow investigation into Plaintiff's account history. (*Id*.)  The Court considers the merits of that interpretation at length but notes it up front for clarity.

The particulars of these investigations are central to this case.  Genesis's policies provide that an investigating agent, "[m]ust review all available relevant information, including any information provided by the CRA and our records," including, but not limited to, "account payment history, any transaction or other dispute history, and any other relevant documentation previously provided by the customer."  (Zelman Decl., Ex. I (Dkt. No. 92-9).)

Defendant used automated, computer investigators to analyze three of the six ACDV disputes.  These programs—nicknamed "Sutherland" systems—looked only at Plaintiff's payment history, and not the account notes, when investigating Plaintiff's payment disputes. (Pl's Resp. 56.1 ¶¶ 85–86; Def's Resp. ¶¶ 85–86.)  Live agents investigated the other three disputes, but they, too, only reviewed Plaintiff's account history.  (Pl's Resp. 56.1 ¶¶ 87, 92; Def's Resp. ¶¶ 87, 92.)[5]  At the end of that process, Defendant responded to each ACDV by verifying delinquencies for July or August 2020.  (Def's 56.1 ¶¶ 40, 43, 46, 59, 52, 55; Pl's Resp. 56.1 ¶¶ 40, 43, 46, 59, 52, 55.)

B. Procedural History

Plaintiff filed her initial Complaint on July 26, 2022.  (*See* Compl. (Dkt. No. 1).) Defendant answered on August 23, 2022.  (Dkt. No. 23.)  On April 24, 2023, after completing discovery, Defendant filed a pre-motion letter in anticipation of the instant Motion for partial summary judgment.  (Dkt. No. 61.)  After receiving Plaintiff's response, (Dkt. No. 63), the Court

---

[5] Defendant's Rule 30(b)(6) witness testified that Genesis customer service representatives would have access to other information in Genesis systems, including the memos in Plaintiff's account notes.  (*See* Dale Dep. at 65.)

held a pre-motion conference on June 29, 2023, and adopted a briefing schedule, (see Order (Dkt. No. 79)).

On August 18, 2023, Defendant filed the instant Motion pursuant to that schedule. (*See* Not. of Mot.; Def's Mem.; Rossman Decl.; Dale Decl.; Bryman Decl.; Rule 56.1 Stmt. ("Def's 56.1") (Dkt. No. 88).) After an extension, (Dkt. No. 90), Plaintiff filed her opposition on September 29, 2023, along with a Motion To Strike portions of Defendant's Motion. (Mem. of Law in Opp. ("Pl's Mem.") (Dkt. No. 91); Decl. of Yitzchak Zelman ("Zelman Decl.") (Dkt. No. 92); Decl. of Lisa Martinez in Opp. (Dkt. No. 93); Pl's Rule 56.1 Stmt. ("Pl's Resp. 56.1") (Dkt. No. 94); Mot. To Strike. ("Pl's Strike Mot.") (Dkt. No. 95).) On October 13, 2023, Defendant filed a reply, a response to Plaintiff's Motion To Strike, and a counter Rule 56.1 statement. (Reply Mem. of Law ("Def's Reply") (Dkt. No. 97); Resp. to Mot. To Strike ("Def's Resp.") (Dkt. No. 96); Counter Stmt. To Pl's 56.1 ("Def's Resp. 56.1") (Dkt. No. 98)).

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Torcivia v. Suffolk Cnty., New York*, 17 F.4th 342, 354 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram*

*Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the non[-]moving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration adopted) (internal quotation marks and citation omitted); *see also U.S. Bank Nat'l Ass'n as Tr. for Reg. Holders of J.P. Morgan Chase Com. Mortg. Sec. Corp., Multifamily Mortg. Pass-Through Certificates, Series 2017-SB42 v. 160 Palisades Realty Partners LLC*, No. 20-CV-8089, 2022 WL 743928, at *3 (S.D.N.Y. Mar. 10, 2022) (same). Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that h[er] allegations were correct; [s]he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)); *see also Jennifer Fung-Schwartz, D.P.M., LLC v. Cerner Corp.*, No. 17-CV-233, 2023 WL 6646385, at *3 (S.D.N.Y. Oct. 12, 2023), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks and citation omitted); *see also Kollias v. Univ. of Rochester*, No. 18-CV-6566, 2023 WL 5608868, at *4 (W.D.N.Y. Aug. 30, 2023) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely

rest on the allegations or denials of his pleading." (quoting *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009))).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Seward v. Antonini*, No. 20-CV-9251, 2023 WL 6387180, at *12 (S.D.N.Y. Sept. 29, 2023) (quoting *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014)).  "At this stage, 'the role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'" *U.S. Sec. & Exch. Comm'n v. Amah*, No. 21-CV-6694, 2023 WL 6386956, at *8 (S.D.N.Y. Sept. 28, 2023) (alteration adopted) (quoting *Brod v. Omya*, 653 F.3d 156, 164 (2d Cir. 2011)).  Therefore, "a court's goal should be 'to isolate and dispose of factually unsupported claims.'" *Id.* (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

When ruling on a motion for summary judgment, a district court should "consider only evidence that would be admissible at trial." *Latimer v. Annucci*, No. 21-CV-1275, 2023 WL 6795495, at *3 (S.D.N.Y. Oct. 13, 2023) (citing *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998)).  "Where a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *Mozzochi v. Town of Glastonbury*, No. 21-CV-1159, 2023 WL 3303947, at *3 (D. Conn. May 8, 2023) (quoting Fed. R. Civ. P.56(c)(4)); *see also DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (same); *E. Fishkill Fire Dist. v. Ferrara Fire Apparatus, Inc.*, No. 20-CV-576, 2023 WL 6386821, at *11 (S.D.N.Y. Sept. 28, 2023) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ." (internal citation omitted)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Martinez v. Pao's Cleaning, Inc.*, No. 16-CV-6939, 2018 WL 6303829, at *2 (E.D.N.Y. Dec. 3, 2018) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005). However, although witness credibility is usually a question of fact for the jury, *Yu Zhang v. Sabrina USA Inc.*, No. 18-CV-12332, 2021 WL 1198932, at *3 (S.D.N.Y. Mar. 30, 2021), "[b]road, conclusory attacks on the credibility of a witness without more [are] insufficient to raise a genuine issue of material fact that would defeat a motion for summary judgment, *Sec. & Exch. Comm'n v. Airborne Wireless Network*, No. 21-CV-1772, 2023 WL 5938527, at *6 (S.D.N.Y. Sept. 12, 2023) (internal quotation marks and citation omitted); *see also Ezuma v. City Univ. of N.Y.*, 665 F. Supp. 2d 116, 128 (E.D.N.Y. 2009) ("If the moving party has made a properly supported motion for summary judgment, the plaintiff may not respond simply with general attacks upon the defendant's credibility." (alterations omitted) (internal quotation marks and citation omitted)). As such, "when opposing a motion for summary judgment, the non-moving party may not respond simply with general attacks upon the declarant's credibility, but rather must identify affirmative evidence from which a jury could find that the non-moving party has carried its burden of proof." *Moritz v. Town of Warwick*, No. 15-CV-5424, 2017 WL 4785462, at *8 (S.D.N.Y. Oct. 19, 2017) (alterations adopted) (internal quotation marks and citation omitted); *see also Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 181 (E.D.N.Y. 2015) ("'Although credibility assessments are improper on a motion for summary judgment,' a court may be justified in dismissing a claim when the 'plaintiff's version of the events is in such discord with the record evidence as to be wholly fanciful.'" (quoting *Pulliam v. Lilly*, No. 07-CV-1243, 2010 WL 935383, at *5 (E.D.N.Y. Mar. 11, 2010))).

11

B.  Analysis

    1.  Plaintiff's Motion To Strike

Before proceeding to the merits, the Court must clarify the scope of Celtic Bank's

Motion.  According to that document, Celtic Bank seeks partial summary judgment on two

issues: "(1) willfulness . . . and (2) reasonableness of the investigations of the January 19,

February 17, and April 14, 2022, ACDVs."  (Def's Mem. 2.)  Plaintiff moved to strike arguments

related to the second issue—reasonableness—based on Defendant's pre-motion letter and its

representations at this Court's June 29, 2023, pre-motion conference.  (*See generally* Pl's Strike

Mot.; *see also* Letter from Michael T. Etmund, Esq., to Court ("Def's Pre-motion Ltr.") (Dkt.

No. 61); Dkt. (minute entry for June 29, 2023).)

    As Plaintiff correctly points out, Defendant's pre-motion letter requested leave to file a

summary judgment motion only "on the issue of a willful violation."  (Def's Pre-motion Ltr.

at 1.)  It did not request a broader ruling on reasonableness.  (*See generally id.*)  At the pre-

motion conference, the Court asked Defendant to follow up confirming the limited nature of its

request, which Defense counsel did in a May 25, 2023, status report.  (*See* Dkt. No. 74.)

    To its credit, Celtic Bank effectively disclaims the reasonableness issue in response to

Plaintiff's Motion.  Instead of seeking a separate "finding of reasonableness as a matter of law,"

Defendant states that it is "arguing reasonableness as an indicator of a lack of willful

noncompliance."  (Def's Resp. at 1.)  Defendant expressly "withdraw[s]" "any ancillary

arguments presented in [its] Memorandum seeking a finding of reasonableness as a matter of law

which may be at variance with the Court's directives."  (*Id*. at 2.)  And Defendant confirms, once

again, that the "focus" of its Motion "rests on whether adequate threshold grounds exist to

warrant punitive damages [i.e., willfulness] to be submitted to the jury."  (*Id*.)  Based on those

clear statements, the Court understands Defendant to have withdrawn is request for partial

summary judgment on the issue of reasonableness.  The Court will address arguments about the reasonableness of particular investigations to the extent they are probative of willfulness "because they were briefed and because Plaintiff has submitted counterarguments," although they "should have been raised in the Pre-Motion Letter."  *See Maldonado v. Town of Greenburgh*, 460 F. Supp. 3d 382, 391 n.5 (S.D.N.Y. 2020) (considering arguments in motion to dismiss not raised in pre-motion letter).

Accordingly, Plaintiff's Motion To Strike is denied as moot.

### 2.  FCRA Willfulness

"The FCRA 'regulates credit reporting procedures to ensure the confidentiality, accuracy, relevancy, and proper utilization of consumers' information.'" *Krausz v. Equifax Info. Servs., LLC*, No. 21-CV-7427, 2023 WL 1993886, at *11 (S.D.N.Y. Feb. 14, 2023) (alteration adopted) (quoting *Longman v. Wachovia Bank, N.A.*, 702 F.3d 148, 150 (2d Cir. 2012)); 15 U.S.C. § 1681(b).  "An entity that reports credit information about consumers to credit reporting agencies is known as a 'furnisher,' and it has certain duties under the FCRA."  *Hart v. Simon's Agency, Inc.*, No. 19-CV-342, 2022 WL 4619863, at *4 (N.D.N.Y. Sept. 30, 2022).  When a furnisher receives notice of "a dispute as to the completeness or accuracy of any information provided" to a CRA, 15 U.S.C. § 1681s-2(b)(1), it must "conduct an investigation," "report the results of the investigation to the consumer reporting agency," and if the disputed information "is found to be inaccurate or incomplete . . . modify that item of information," *id*. § 1681s-2(b)(1)(A)–(E).  In addition, a furnisher must complete its investigation within 30 days.  *See id*. § 1681s-2(b)(2).

"To prevail on a claim under [§] 1681s-2(b), a plaintiff must show that '(1) the furnisher received notice of a credit dispute from a credit reporting agency, and (2) the furnisher thereafter acted in willful or negligent noncompliance with the statute.'" *Pierre v. Wells Fargo Fin. Nat'l Bank*, No. 21-CV-3141, 2022 WL 4625350, at *2 (S.D.N.Y. Sept. 30, 2022) (quoting

*Markovskaya v. Am. Home Mortg. Servicing, Inc.*, 867 F. Supp. 2d 340, 343–44 (E.D.N.Y. 2012)).  "[O]ne of the core ways in which a plaintiff may establish willful or negligent noncompliance" is to show that "the furnisher failed to *reasonably* investigate the plaintiff's dispute." *Frederick v. Cap. One Bank (USA), N.A.*, No. 14-CV-5460, 2018 WL 1583289, at *7 (S.D.N.Y. March 27, 2018) (internal quotation marks omitted) (emphasis in original).  Plaintiff's claim here relies on the same theory, and Defendant seeks partial summary judgment on a subset of that claim: whether Defendant's conduct in investigating Plaintiff's disputes was "willful."

FCRA willfulness, in turn, typically involves a showing "that the defendant knowingly and intentionally committed an act in conscious disregard for the rights of others" or "intentionally misled consumers or concealed information from them."  *Owoyemi v. Credit Corp Sols. Inc.*, — F. Supp. 3d —, 2023 WL 4053134, at *10 (S.D.N.Y. June 16, 2023) (quoting *Frederick*, 2018 WL 1583289, at *10).  To survive summary judgment, "a plaintiff must set forth affirmative evidence demonstrating conscious disregard," above and beyond mere "assertions that '[the] defendants' violations were deliberate.'"  *Id*. (quotation marks omitted) (quoting *Burns v. Bank of Am.*, 655 F. Supp. 2d 240, 252 (S.D.N.Y. 2008), then *Perez v. Experian*, No. 20-CV-9119, 2021 WL 4784280, at *11 (S.D.N.Y. Oct. 14, 2021), *report and recommendation adopted*, No. 20-CV-9119, 2021 WL 5088036 (S.D.N.Y. Nov. 2, 2021)); *see also Suluki v. Credit One Bank, NA*, — F. Supp. 3d —, 2023 WL 2712441, at *8 (S.D.N.Y. Mar. 30, 2023) (same).

In *Safeco Insurance Company of America v. Burr*, 551 U.S. 47 (2007), the Supreme Court held that "willfully" also encompasses actions taken "in 'reckless disregard of statutory dut[ies]'" imposed by the FCRA.  *Shimon v. Equifax Info. Servs. LLC*, 994 F.3d 88, 93 (2d Cir. 2021) (quoting *Safeco*, 551 U.S. at 57); *see also Frydman v. Experian Info. Sols., Inc.*, No. 14-

CV-9013, 2016 WL 11483839, at *16 (S.D.N.Y. Aug. 11, 2016) (same), *report and recommendation adopted*, No. 14-CV-9013, 2016 WL 5661596 (S.D.N.Y. Sept. 30, 2016). To show recklessness, Plaintiff must demonstrate "not only a violation under a reasonable reading of the statute's terms, but [also] that the Company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Crupar-Weinmann v. Paris Baguette Am., Inc.*, 41 F. Supp. 3d 411, 413 (S.D.N.Y. 2014) (quoting *Safeco*, 551 U.S. at 47). A company does not act in "'reckless disregard' of the FCRA, however, if its reading of the statute was not objectively unreasonable." *Shimon*, 994 F.3d at 93 (internal quotation marks and alteration omitted) (quoting *Safeco*, 551 U.S. at 69).

### a. Knowledge

Celtic Bank first contends that it did not "knowingly" violate the FCRA. (Def's Mem. 10–11.) It suggests, correctly, that "knowing violations are sensibly understood as a more serious subcategory of willful ones." *See Safeco*, 551 U.S. at 59. Most courts construe that inquiry to require "conscious disregard," or "deliberate" actions in violation, of statutory duties, as distinct from recklessness, which entails disregard of an unreasonable *risk* that actions run afoul of those duties. *See Owoyemi*, 2023 WL 4053134, at *10; *see also Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 105 (2016) (citing Restatement (Second) of Torts § 8A ("If the actor knows that the consequences are certain, or substantially certain, to result . . . he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases . . . the actor's conduct loses the character of intent, and becomes mere recklessness . . . .")); *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 476 (2d Cir. 1995) (requiring showing of "conscious disregard" or "'deliberate and purposeful' actions"); *George v. Equifax Mortg. Servs.*, No. 06-CV-971, 2010 WL 3937308, at *2 (E.D.N.Y. Oct. 5, 2010) (same).

15

The Court agrees with Defendant that a rational factfinder could not find evidence of such deliberate activity here. At the very least, Defendant acknowledged its duty under the FCRA and conducted investigations immediately after receiving each ACDV related to Plaintiff's disputes. (*See* Def's 56.1 ¶ 37; Pl's 56.1 ¶ 37.) Even if Defendant's approach to those investigations was unreasonably risky, the fact that it acknowledged and nominally exercised that duty "cuts against a finding" a knowing violation. *See Jackling v. HSBC Bank USA, N.A.*, No. 15-CV-6148, 2019 WL 162743, at *10 (W.D.N.Y. Jan. 10, 2019); *see also Trikas v. Universal Card Servs. Corp.*, 351 F. Supp. 2d 37, 45 (E.D.N.Y. 2005) (finding no willfulness under pre-*Safeco* standard where a bank "initiated its investigation almost immediately after receiving the CDVs").[6]

The evidence is similarly clear that Celtic Bank was not consciously aware that a violation *would* result from its chosen approach. As explained in greater detail below, Defendant determined that a review of Plaintiff's payment history, alone, was appropriate in response to her disputes. (Def's Mem 17–23.) Nothing in the record indicates that Defendant *knew* that approach was unreasonable at the time it conducted the investigations. *See Perez*, 2021 WL 4784280, at *11 ("[A] plaintiff must allege facts 'related to defendants' state of mind when they allegedly violated the FCRA.'" (alteration adopted) (quoting *Perl v. Plains Com. Bank*, No. 11-CV-7972, 2012 WL 760401, at *2 (S.D.N.Y. Mar. 8, 2012))). Again, however, this "more

_____

[6] Defendant relies on both *Jackling* and *Trikas* heavily in support of its argument that any violation was not "knowing." (Def's Mem. 11–12.) Although Defendant does not make this argument, the Court notes for the sake of clarity that these cases do not speak to recklessness. *See generally Jackling*, 2019 WL 162743; *Trikas*, 351 F. Supp. 2d 37. Thus, even if a furnisher acknowledges its § 1681s-2(b) duty to *conduct* an investigation, it may still *carry out* that investigation in a reckless manner.

serious" mental state, *see Safeco*, 551 U.S. at 59, is distinct from disregarding a significant risk of violating the FCRA.

Plaintiff does not appear to contest Defendant's arguments on this front.[7]  Indeed, Plaintiff frames her arguments exclusively in terms of recklessness, stating repeatedly that "the sole question is . . . did the Defendant recklessly fail to comply with its duty to conduct a reasonable investigation."  (*See, e.g.*, Pl's Mem. 23; *see also id*. at 3 ("The *only* question before this Court is . . . has the Defendant demonstrated, *as a matter of law*, that its deficient investigations were nonetheless not in reckless disregard of the FCRA's requirements?" (emphasis in original)); *id*. at 20 ("There is thus a clear question of fact as to whether Defendant's representatives acted recklessly . . . .").)  Accordingly, Celtic Bank is entitled to summary judgment on the limited issue of whether it "knowingly" violated § 1681s-2(b).

### b.  Recklessness

Recklessness, however, is a different matter.  Celtic argues that summary judgment is appropriate here, too, because it (1) operated under a reasonable interpretation of the FCRA and (2) even if it did not, its conduct did not run a substantial risk of violating the law.  (Def's Mem. 9–25.)  Plaintiff contests whether Defendant proffered an interpretation at all and argues there is a dispute of fact about whether Defendant ignored a high risk that its investigative approach was unreasonable.  (Pl's Mem. 9–18.)  The Court considers each issue in turn.

---

[7] Plaintiff at one point incorrectly asserts that the "'knowing' standard for willfulness . . . has been abrogated by the Supreme Court in *Safeco*."  (Pl's Mem. 22.)  This view perhaps explains Plaintiff's decision not to argue a knowing violation.  In any event, it is not accurate. *Safeco* held that "willfulness" generally "cover[s] not only knowing violations of a standard, but reckless ones as well."  551 U.S. at 57.  Courts in this District are in lockstep with that understanding.  *See, e.g.*, *Suluki*, 2023 WL 2712441 at *8 ("Willfulness can be found on either a knowing or reckless basis.").

*Safeco* established a threshold defense to FCRA recklessness, holding a defendant does not act in "reckless disregard" if it adopts a reading of the FCRA that "was not objectively unreasonable." *Shimon*, 994 F.3d at 93 (quoting *Safeco*, 551 U.S. at 69).  If a defendant does so, there is no need to examine whether it ran an "unjustifiably high risk" of violating the statute. *Safeco*, 551 U.S. at 69.  In other words (and clearing up the double negative): "a company's reading of the statute must be objectively unreasonable" for it to "commit a willful violation." *Wilson v. First Advantage Background Servs. Corp.*, 490 F. Supp. 3d 506, 514 (D. Conn. 2020) (internal quotation marks and citation omitted).

The Parties provide little information about how to conduct this analysis, so some discussion of the caselaw is required.  Starting off, *Safeco* dealt with a black-and-white interpretive dispute.  Safeco believed that a notice provision in 15 U.S.C. § 1681m(a) did not apply to first-time insurance applicants, while a class of such applicants believed that they were covered.  *See Safeco*, 551 U.S. at 58.  The Supreme Court determined that Safeco's interpretation was "erroneous," but nevertheless not "objectively unreasonable" because it had some basis in "the less-than-pellucid statutory text," and because there was no authoritative agency or appellate court guidance.  *Id*. at 69–70; *see also Wilson*, 490 F. Supp. 3d at 515 (applying similar analysis to 15 U.S.C. § 1681b(b)(3)(A)).

The analysis is more complicated with respect to § 1681s-2(b), however.  Unlike *Safeco*, the Parties agree that § 1681s-2(b) applies, and that Celtic Bank had a duty to investigate Plaintiff's disputes.  Beyond that, the statute does not "specify what *type* of investigation must take place." *Owoyemi*, 2023 WL 4053134, at *8 (internal quotation marks omitted) (quoting *Frederick*, 2018 WL 1583289, at *7).  Although the Second Circuit has yet to determine a governing standard, "other circuit and district courts" to consider the question have held an

investigation must be "reasonable." *Id.* (collecting cases); *see, e.g.*, *SimmsParris v. Countrywide Financial Corp.*, 652 F.3d 355, 359 (3d Cir. 2011) (applying reasonableness standard); *Johnson v. MBNA America Bank, NA*, 357 F.3d 426, 432 (4th Cir. 2004) (same); *see also Jenkins v. Cap. One, N.A.*, No. 14-CV-5683, 2017 WL 1323812, at *6 (E.D.N.Y. Feb. 28, 2017) (same).  What constitutes reasonableness turns on the facts, and is viewed "in light of what the furnisher learned about the nature of the dispute" from the CRA.  *Frederick*, 2018 WL 1583289, at *7 (alteration adopted) (quoting *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 (9th Cir. 2009)).

Against this backdrop, it is difficult to evaluate Celtic Bank's *Safeco* defense.  The only interpretation of § 1681s-2(b) offered by Celtic is the one discussed above: that "a 'reasonable' investigation is required" based on the "information provided about Plaintiff's disputes."  (Def's Mem. 18; *see also* Def's Reply 9–10.).  But unlike *Safeco*, nothing about that interpretation is dispositive of recklessness.  In that case, Safeco adopted a reading of the statute that necessarily established compliance with the FCRA.  *See Safeco*, 551 U.S. at 69.  Stated differently, because Safeco reasonably believed that § 1681m(a) did not apply, it *could not* have disregarded a high risk of violating that same provision.  Here, by contrast, Celtic could *both* interpret the statute to require reasonableness but conduct its investigations in a manner that raised an unjustifiably high risk of falling below that standard.  Appearing to recognize this problem, Celtic does not actually argue that its interpretation of the statute dispels liability.  Instead, it supports this argument by explaining why the investigations *themselves* were reasonable under the circumstances.  (*See* Def's Mem. 16–24.).

On this point, the Court finds persuasive a recent First Circuit decision recognizing the same conundrum.  In *McIntyre v. Rentgrow, Inc.*, 34 F.4th 87 (1st Cir. 2022), the court examined a claim that a CRA recklessly violated § 1681e(b), which requires that CRAs "follow reasonable

procedures to assure maximum possible accuracy" of reported information.  *McIntyre*, 34 F.4th at 96.  In that situation, *McIntyre* explained that "compliance does not turn squarely on statutory interpretation but, rather, on the facts."  *Id*.  The *Safeco* analysis thus boiled down to a single question: "whether a CRA acted in disregard of facts that would make it obvious, considering the totality of the circumstances, that there was an unjustifiably high risk that it was not complying with the statute."  *Id*.; *see also Cortez v. Trans Union, LLC*, 617 F.3d 688, 721 (3d Cir. 2010) (stating that "[t]he fact that Trans Union's actions rest upon a legal conclusion does not immunize it from liability for reckless conduct" and that "[a] credit reporting agency may also willfully violate the FCRA by adopting a policy with reckless disregard of whether it contravenes a plaintiff's rights"); *Frydman*, 2016 WL 11483839, at *15 (favorably citing *Cortez*); *Nguyen v. Ridgewood Sav. Bank*, No. 14-CV-1058, 2015 WL 2354308, at *10 (E.D.N.Y. May 15, 2015) (same).  The Court adopts the same approach here, as the (un)reasonableness of Defendant's interpretation effectively merges with an inquiry into whether its conduct was reckless.

That question turns on whether a jury could find that Celtic conducted investigations in disregard of facts that would have made it obvious that those investigations were unreasonable. To answer that question, the Court must consider, in broad terms, what § 1681s-2(b) requires under the circumstances and whether Celtic's conduct created a substantial risk of falling below that standard.

As to what § 1681s-2(b) requires—i.e., what a *reasonable* investigation entails—the Court starts with the text.  "Investigation," which is the key term in the statute, is "defined as 'a detailed inquiry or systematic examination'" or "a searching inquiry."  *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 430 (4th Cir. 2004) (quoting Am. Heritage Dictionary 920 (4th

20

ed. 2000), then Webster's Third New Int'l Dictionary 1189 (1981)).  The term thus connotes "some degree of careful inquiry" as opposed to a merely "superficial" one.  *Id.*  Caselaw in the Second Circuit suggests that a reasonable investigation to verify a reported debt "typically includes a review of records" associated with the disputed account.  *Owoyemi*, 2023 WL 4053134, at *9; *see also Llewellyn v. Asset Acceptance, LLC*, No. 14-CV-411, 2015 WL 6503893, at *8 (S.D.N.Y. Oct. 26, 2015) (finding investigation reasonable where furnisher "reviewed all of its records pertaining to the account, as well as those provided by Citibank, in order to confirm that the information [it] was reporting to the [CRAs] matched its internal records"), *aff'd*, 669 F. App'x 66 (2d Cir. 2016) (summary order); *Jenkins v. LVNV Funding, LLC*, No. 14-CV-5682, 2017 WL 1323800, at *11–12 (E.D.N.Y. Feb. 28, 2017) (similar); *Johnson*, 357 F.3d at 431 (holding § 1681s-2(b) requires creditors "to conduct a reasonable investigation of their records").

Defendant here investigated one type of record—Plaintiff's payment history—in response to the dispute notices it received from CRAs.  Defendant argues that this narrow approach was not reckless, as a matter of law, given the limited information in those dispute notices and Plaintiff's inconsistent inquiries.  (Def's Mem. 17.)  In essence, Defendant believes that Plaintiff falsely denied that she was delinquent and that Defendant appropriately limited its investigation to Plaintiff's payment history.  (*See* Def's Mem. 15–16, 17–22 (noting multiple purported "denial[s]").)  Thus, even if other records were *available*, Defendant determined that those records were not *relevant* to Plaintiff's disputes.  (*See, e.g.*, *id*. at 18.)  Plaintiff argues that she in fact disputed the *reporting* of a delinquency based on her conversations with Defendant's representatives.  (*See* Pl's Mem. 10–11.)  This issue is at best disputed, and various aspects of the record preclude summary judgment.

As an initial matter, Defendant has not adduced sufficient evidence to meet its burden.

Celtic must support its Motion with "at least some evidence of what the investigation[s] actually

entailed" in order for the Court to determine they are not reckless as a matter of law. *See*

*Owoyemi*, 2023 WL 4053134, at \*9. Courts in the Second Circuit have thus denied summary

judgment where furnishers did not provide testimony by an "employee involved in investigating

[the p]laintiff's disputes" that was able to "detail the exact nature and scope of [the defendant's]

investigation." *Jenkins*, 2017 WL 1323812, at \*7 (finding testimony of compliance manager

with no personal knowledge of what "business records were relied upon in investigating"

disputes insufficient to support summary judgment); *see also Dickman v. Verizon Commc'ns,*

*Inc.*, 876 F. Supp. 2d 166, 173 (E.D.N.Y. 2012) (holding issue of fact existed regarding

reasonableness where furnisher offered "no testimony" from "employees who actually conducted

the . . . required investigation"). Although *Jenkins* and *Dickman* both considered reasonableness,

as opposed to recklessness, the same logic applies here. If no one can testify to what the

investigations actually entailed, there is a fact dispute about whether any investigation that did

occur was reckless.

Plaintiff correctly notes that the record lacks such evidence. (Pl's Mem. 17–18.) Celtic

cites only two sources to establish the scope of its investigations: testimony from Misty Dale, a

compliance manager, and the ACDV records that it received from the CRAs. (*See* Def's 56.1 ¶¶

36–45 (citing Dale Decl.; *id.*, Exs. AA-EE ("ACDV Records")).)[8] Dale states in her declaration

that Genesis "analyzed Plaintiff's payment history" in response to each dispute but cites no basis

---

[8] The record contains a letter to Plaintiff regarding the results of these investigations,
(*see* Bryman Decl. Ex. U (Dkt. No. 84-21)), but it does not explain what the investigations,
themselves, entailed.

for that statement.  (Dale Decl. ¶¶ 10, 13, 16, 19, 22, 25.)  And in her deposition, Dale explains

that she lacks personal knowledge of what actually occurred:

> Q:    So just to be clear, you don't have actual knowledge of what the agents
> would have done in response to a dispute, you're just basing it on what they
> should have done with regard to Genesis' policies and procedures?
> A:    My responses and conclusions on the disputes are based on my personal
> review of the payment history and what was disputed when it came in.

Dale Dep. 27-28; *see also id*. at 50 (confirming Genesis associate did not document investigation

and stating "[b]ased on these memos, I can't tell specifically what they looked at").)  The ACDV

records are not much help, either.  Those records memorialize the receipt of notice, contain the

content of that notice, and state a "Response Code."  (*See generally* ACDV Records.)  But they

do not confirm that an investigation occurred or explain what the investigation involved.  These

evidentiary gaps are significant, and they preclude a finding that the investigations were not

reckless as a matter of law.  *See Bank of Baroda, N.Y. Branch v. Kejriwal Newsprint Mills, LLC*,

No. 21-CV-06982, 2022 WL 3755270, at *2 (S.D.N.Y. Aug. 30, 2022) ("[A]n affidavit 'used to

support or oppose a motion must be made on personal knowledge'" (quoting Fed. R. Civ. P.

56(c)(4)).

Even assuming Defendant met that threshold requirement, a reasonable jury could still

find that Defendant recklessly reported debts as verified without a reasonable investigation.

Celtic keeps at least two types of records related to consumer accounts: the account's "payment

history" and "account notes," which include "memos where [] agents would memo interactions

with the consumer or actions taken on the accounts."  (*See* Dale Dep. at 24.)  Included in those

notes are records of AUDs—forms that furnishers submit to CRAs "after determining that data

reported to the CRAs was not complete or accurate."  (Def's 56.1 ¶ 56; *see also* Account Notes

(including record of AUD); Dale Dep. at 24 (confirming same).)  A straightforward reading of

23

the caselaw suggests that a reasonable investigation would require reviewing both types of "records" even in response to a single disputed payment. *See Johnson*, 357 F.3d at 430. According to Dale, Defendant's agents should have done exactly that in this case. (Dale Dep. 50–51.) It is easy to see why. An inquiry into payment history, alone, risked overlooking actions taken to remove the debt or other evidence that the debt was inaccurate. A jury could also find such a risk to be "substantial" as opposed to merely "careless." Viewed in Plaintiff's favor, the evidence suggests that Defendant *knew* that payment history was incomplete but chose to disregard this limitation anyway, believing other available information to be irrelevant. That knowledge and acceptance of risk "is the essence of recklessness at common law." *See Safeco*, 551 U.S. at 69 (internal quotation marks and citation omitted). Confirming that intuition, Plaintiff points to an Eleventh Circuit case reaching a virtually identical conclusion. It held that summary judgment on willfulness was inappropriate where a furnisher used an automated investigation system that did "not incorporate review by [] employees capable of analyzing disputed accounts and initiating requests for account-level documentation where appropriate." *Hinkle v. Midland Credit Mgmt., Inc*., 827 F.3d 1295, 1307 (11th Cir. 2016). It explained that the furnisher could have adopted such a system "with reckless disregard for the fact that it would result in perfunctory review in contravention of the FCRA." *Id*. A jury could reach the same conclusion here.

Defendant's arguments to the contrary are unavailing. First, Defendant contends that the ACDVs were framed so narrowly that account notes are irrelevant to verifying the disputed information. (Def's Mem. 17–23.) The ACDVs all state that Plaintiff disputed her "present/previous Account Status/Payment Rating/Account History," (*see id*.; ACDV Records), and four contain additional information. The February 17, 2022, ACDV, for instance, contains

24

statements form Plaintiff that she believed Celtic would "not [be] reporting any late payments" on her account. (Dale Decl. Ex. AA (capitalization omitted).) And the May 11, 2022, ACDV includes language that Plaintiff was "never late paying this account" and that she had "already file[d] this to CFPB." (*Id*. Ex. CC.) Thus, although there is some language indicating that Plaintiff contested whether she was ever late in making payments, there is also language contesting the reporting of late payments on Plaintiff's account. These dueling statements, at a minimum, highlight why summary judgment is inappropriate. In addition, it is not clear that Defendant's interpretation is entirely consistent. Recall that the CFPB complaint, in part, led Defendant to "request[] that the CRAs remove the delinquency from August 2020 from [Plaintiff's] credit report." (Def's 56.1 ¶¶ 29–30.) Arguably, that complaint put Defendant on notice about the true nature of Plaintiff's dispute.

Second, Defendant interprets those same notices to only contest the delinquency *itself* and not the *reporting* of the delinquency. (*See, e.g.*, Def's Mem. 18; Def's Reply 7.) If Plaintiff complained only to Celtic, that distinction could make sense. But the filing of a complaint *with the CRAs* evinces a dispute about the appearance of the delinquency on the credit report, not just a dispute about the debt itself. (*See* ACDV Records.) A jury could conclude that a reasonable investigation should encompass records addressing whether to report the debt, in addition to records about the debt itself.[9]

---

[9] Celtic argues in a footnote that Plaintiff's claim turns on a legal dispute about whether the debt was enforceable based on the terms of her deferment agreement. (Def's Mem. 18 n.4.) At least two courts in this District have held that a claimed inaccuracy that "relies entirely on [a] legal conclusion" is "insufficient to support [a] FCRA claim." *Holland v. Chase Bank USA, N.A.*, 475 F. Supp. 3d 272, 277 (S.D.N.Y. 2020); *see also Mohnkern v. Equifax Info. Servs., LLC*, No. 19-CV-6446, 2021 WL 5239902, at *6 (W.D.N.Y. Nov. 10, 2021) (stating *Holland* "represent[s] the prevailing view when courts deal with the type of claim asserted against furnishers"). The logic is that a furnisher "[is] neither qualified nor obligated to resolve matters that turn on [a] question[] that can only be resolved by a court of law." *Chiang v. Verizon New*

Third, Celtic suggests several ancillary portions of the record—including Plaintiff's purportedly confusing phone calls and Defendant's affirmative actions taken in response—weigh against willfulness. (*See* Def's Mem. 14–17.) As an initial matter, Defendant's § 1681s-2(b) duty concerns solely whether it "conduct[ed] a reasonable investigation of the disputed information." *See, e.g.*, *Suluki*, 2023 WL 2712441 at *6. Celtic cites no authority that other non-investigation-related facts may establish the reasonableness of an investigation as a matter of law. The remaining determination—whether circumstantial evidence establishes that a defendant "took action knowing that [it] was violating a legal standard or with recklessness as to that point—is a determination classically and commonly made by juries." *See Sec. & Exch. Comm'n v. AT&T, Inc.*, 626 F. Supp. 3d 703, 779 (S.D.N.Y. 2022); *see also Wechsler v. Steinberg*, 733 F.2d 1054, 1058 (2d Cir. 1984) ("Issues of motive and intent are usually inappropriate for disposition on summary judgment."); *cf. Akalwadi v. Risk Mgmt. Alternatives, Inc.*, 336 F. Supp. 2d 492, 510 (D. Md. 2004) ("It is generally a question of fact for the jury as to whether a reasonable investigation was conducted."). Moreover, viewed in Plaintiff's favor, those facts support recklessness just as much as they weigh against it. Defendant touts its quick resolution of Plaintiff's phone complaints and the five AUDs it submitted to CRAs in response. (Def's Mem. 13–14.) Yet it repeatedly verified the exact same information it expeditiously asked the CRAs to delete. That disconnect bolsters the fact dispute about whether Defendant's investigations were excessively narrow.

---

*Eng. Inc.*, 595 F.3d 26, 38 (1st Cir. 2010) (alteration adopted) (internal quotation marks and citation omitted). Nevertheless, "[t]he Second Circuit has not addressed whether an alleged legal dispute . . . renders [a] debt 'inaccurate' for the purposes of a section 1681s-2(b) claim against a furnisher," *Mohnkern*, 2021 WL 5239902, at *6, and the Court sees no need to weigh in on that question here. To the extent there was a legal dispute, Defendant examined that issue and concluded it was inappropriate to report the delinquency, as evidenced by its five separate AUDs requesting removal of that information. (*See* Def's Mem. 14; Def's 56.1 ¶ 56 (explaining an AUD reflects a "determin[ation] that data reported to the CRAs was not complete or accurate").)

Finally, Defendant argues that Plaintiff has failed to "point to any actual factual 'inaccuracy' that could form the basis for liability under the FCRA." (Def's Reply 7.) Putting aside the fact that Defendant did not move for summary judgment on this basis, the record does not support its argument. Celtic supports its position by citing caselaw requiring a Plaintiff to demonstrate that "had the furnisher conducted a reasonable investigation, the result would have been different. (Def's Reply 7–8 (quoting *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1313 (11th Cir. 2018) (internal quotation marks omitted)).) But Plaintiff has pointed to a fact dispute about exactly that issue. (*See* Pl's Reps. 56.1 ¶¶ 82–84.) Indeed, an investigation of Plaintiff's account records could have uncovered the note that Defendant had asked CRAs to remove her August 2020 delinquency. (*See* Account Notes at 1.) A jury could conclude that Defendant would have declined to verify the debt after reviewing that information.

### III.  Conclusion

For the foregoing reasons, Defendant's Motion is granted in part and denied in part, and Plaintiff's Motion is denied as Moot. Specifically, Defendant's Motion is granted as to whether it "knowingly" violated the FCRA but denied as to whether it acted "recklessly."

The Court will hold a status conference on March 27, 2024, at 12:00 PM. The Clerk of Court is respectfully requested to terminate the pending motions, (Dkt. Nos. 80, 95).

SO ORDERED.

Dated:   March 8, 2024
         White Plains, New York

_____
KENNETH M. KARAS
United States District Judge